# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:21-cr-355 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| DANIEL RICHTER, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Daniel Richter ("Richter") seeks suppression of all evidence seized from his residence pursuant to a search warrant by law enforcement on April 13, 2021. (Doc. No. 24 (Motion).) By the same motion, Richter seeks a ruling from the Court *in limine* to prevent his therapist from testifying at trial. (*Id.*) Plaintiff United States of America (the "government") opposes exclusion of the fruits of the search of Richter's residence and further opposes any limitation on its ability to call Richter's therapist in its case-in-chief. (Doc. No. 29 (Opposition); *see* Doc. No. 31 (Reply).)

On October 15, 2021, the Court conducted a hearing on the motion. At the conclusion of the hearing, the Court took the matter under advisement and permitted the parties to submit post-hearing briefs. (Doc. No. 35 (Richter's Post-Hearing Brief); Doc. No. 36 (Government's Post-Hearing Brief).) Having fully afforded the parties an opportunity to be heard on the matter, the Court is prepared to issue its ruling.

I. **BACKGROUND**

The facts leading up to the execution of the search warrant, and ultimately the filing of federal charges against Richter, are not in dispute. On November 30, 2010, Richter was convicted in state court, following his guilty plea, of multiple counts of pandering sexually explicit material involving a minor and was sentenced to five years of community control. (Doc. No. 1-1, Complaint Affidavit at 3[1].) During this period of supervised release, Richter received therapeutic treatment from Silke Pagendarm, a licensed professional clinical and chemical dependency counselor who, according to Richter, "specializes in counseling clients with problematic sexual behaviors." (Doc. No. 24 at 7.) In 2015, Richter finished his period of community control and at some point also discontinued his therapy with Ms. Pagendarm.

Richter reports that, in September 2020, he began "having difficulty coping with feelings of isolation and depression during the pandemic," and "voluntarily resumed treatment with Ms. Pagendarm[.]" (*Id*.) It is alleged that in one of the counseling sessions, Richter advised his therapist that he was viewing child pornography on his computer. After consulting with the Counselor and Social Worker Board, the therapist determined that she was required under Ohio law to report this communication. She ultimately contacted law enforcement and a criminal investigation ensued.

On April 9, 2021, Federal Bureau of Investigation ("FBI") Special Agent Lisa Hack ("S.A. Hack") filed an application for a warrant to search Richter's residence in South Euclid, Ohio. The supporting affidavit provided, in relevant part:

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

2

12. On March 18, 2021, the National Threat Operations Center received a complaint from a therapist working for Humanistic Counseling Center, 26250 Euclid Avenue, Suite 527, Euclid, Ohio. The therapist[] reported a self-referred client of the center, who is already a registered sex offender, admitted to still viewing child pornography on the computer. The therapist consulted with the Counselor and Social Worker Board who advised the therapist this information is not protected and should be reported to law enforcement.

13. On March 23, 2021, your Affiant received additional information from the aforementioned therapist[] who reported that DANIEL RICHTER was originally a client with the counseling center about five years ago after being charged with pandering sexually exploited [sic] material involving a minor. According to [the] therapist, DANIEL RICHTER stopped coming after six months because he did not want to do the work required by the therapist.

14. Your Affiant searched the Cuyahoga County Court docket on-line and confirmed DANIEL RICHTER was indicted on April 7, 2010 of twenty two (22) counts of pandering sexually oriented material involving a minor and one count of possession of criminal tools in case CR-08-517174-A, The State Of Ohio v. Daniel Richter. According to the court docket, DANIEL RICHTER plead [sic] guilty to 22 counts of sexually pandering sexually oriented material involving a minor and one count of possession of criminal tools on November 30, 2010, and was sentenced to five years of community control. This sentence of community control terminated on November 30, 2015.

15. According to the therapist, DANIEL RICHTER re-initiated counseling as a self-referral on September 9, 2020. On March 16, 2021, DANIEL RICHTER admitted to his therapist that RICHTER still views child pornography. The therapist advised that RICHTER described the images he views as pre-pubescent and pubescent images involving oral sexual stimulation, masturbation, as well as images of adults and minor children together engaged in sexual activity. The therapist stated DANIEL RICHTER eluded [sic] to storing the aforementioned material on a "jump drive" or memory stick. DANIEL RICHTER has told the therapist that RICHTER began looking at child pornography when he was approximately 12 or 13 years of age and has been recently viewing child pornography several times a week.

16. The therapist further reported that RICHTER has been known to have a desktop computer, as he bought the computer in [order] to add parental control software, as well as an IPad and a smart phone.

(Doc. No. 24-1, Warrant Application and Supporting Affidavit at 15–17.)[2]

The warrant application was approved by Magistrate Judge Jonathan D. Greenburg on April 9, 2021, and the warrant was executed four days later on April 13, 2021. (*See id*. at 25.) Richter was present during the search and spoke with agents on the scene, during which he purportedly admitted that he had viewed child pornography in the past and that he had recently "relapsed" and was once again viewing child pornography. Agents also recovered a black 4 GB Toshiba thumb drive from Richter's residence that allegedly contained numerous images/videos of child pornography. (Doc. No. 20 at 3–4.)

A complaint issued on April 13, 2021, and, on May 13, 2021, an indictment was filed charging Richter with one count of receipt of visual depictions of real minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Doc. No. 10 (Indictment).)

**II. MOTION TO SUPPRESS**

As an initial matter, the Court observes that much of Richter's motion and briefing is devoted to the argument that Richter's therapist erred in her assessment that she was required under Ohio law to report her communications with Richter regarding his viewing of child pornography. Under Ohio Rev. Code § 2151.421(a), certain professionals, including therapists, are required to make a report to authorities whenever they know or reasonably suspect that a child "has suffered or faces a threat of suffering" a serious injury, neglect, or abuse.

---

[2] In a footnote, the affidavit stated that "[t]he therapist provided her full name and place of employment during the report." (*Id*. at 16 n.1.) In a second footnote, the affidavit provided that "Affiant spoke directly with the therapist. The therapist confirmed their identity. Affiant also conducted independent research on the counseling center and confirmed that the therapist was licensed and listed as an employee with the center. The name is withheld in this affidavit to protect the therapist's identity." (*Id*. n.2.)

Additionally, under Ohio Rev. Code § 2305.51(B), a mental health professional can be liable for damages for serious injury or death resulting from "failing to predict, warn of, or take precautions" to provide potential victims with protection from the violent behavior of a mental health patient.

Without citing any case law, Richter argues that the reporting requirement in § 2151.421(a) is only triggered when an *identifiable* child is in jeopardy. Because no specific child victim could be identified as facing danger from Richter's online activities, Richter argues that there was no obligation to report. (Doc. No. 35 at 2–3, emphasis in original.) The government, relying entirely on federal law, argues that there is no need to identify a specific child victim because any time an individual views child pornography there are countless victims that suffer real and lasting physical and emotional injuries from the perpetuation of the child pornography market. (Doc. No. 36 at 4.) *See New York v. Ferber*, 458 U.S. 747, 759, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982) (recognizing that the distribution of pornography is harmful to children as it provides a record of a child's involvement therein and sustains the market for such illicit material); *Doe v. Boland*, 698 F.3d 877, 880 (6th Cir. 2012) ("pornography injures a child's 'reputation and emotional well-being'") (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 249, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002)); *United States v. Mathis*, 377 F. Supp. 2d 640, 646 (M.D. Tenn. 2005) (finding that a therapist was required under a similar Tennessee statute to report that defendant was viewing pornography to "prevent serious harm to the children depicted

in the images or other potential child sexual abuse victims")[3]. The Court need not resolve this debate over state law reporting obligations. As discussed below, regardless of whether Ms. Pagendarm was required under Ohio law to report Richter's online activities, law enforcement officers were entitled to rely on the volunteered information in seeking a warrant.

A.  **The Psychotherapist-Patient Privilege**

Richter bases his right to exclusion on the psychotherapist-patient privilege as established by *Jaffee v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996) and revisited by the Sixth Circuit in *United States v. Hayes*, 227 F.3d 578 (6th Cir. 2000). Because he believes that his therapist violated this privilege when she voluntarily revealed the contents of his confidential communications to the authorities, he argues that any statements made by him to the police and any evidence obtained by means of the search warrant that relied on these confidential communications must be suppressed. (Doc. No. 24 at 15–18.) Richter misunderstands the nature of, and the protection afforded, by the privilege.

In *Jaffee*, the Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from *compelled* disclosure under Rule 501 of the Federal Rule of Evidence." *Jaffee*, 518 U.S. at 15 (emphasis added). The Sixth Circuit, in *Hayes*, reiterated that the protection is exclusively

---

[3] While the parties have failed to identify any Ohio case law interpreting a therapist's statutory duty to report the suspected viewing of child pornography, and the Court's independent research did not reveal any, the district court's treatment of a similar Tennessee reporting law in *Mathis* would suggest that Ms. Pagendarm was required to report the conduct. Such a result would at least be consistent with the decision in *Yates v. Mansfield Bd. of Educ.*, 808 N.E.2d 861 (Ohio 2004), wherein the Ohio Supreme Court found that the duty to warn did not extend solely to the known child victim. There, the court reasoned that it was inappropriate to focus exclusively on the word "child" in Ohio Rev. Code § 2151.421(B) and found that it was not the case that the "statutory reporting duty runs solely to the *identified abused child* in the situation where the reporter to whom that child's control and protection has been entrusted also has direct control over the alleged perpetrator, *other potential victims*, and the environment in which they are brought together." *Id.* at 867 (emphasis added). As an alleged viewer of child pornography, Richter had access to the images of many children, making the potential victims of this conduct numerous.

afforded to compelled disclosure. *Hayes*, 227 F.3d at 581–82 (citing *Jaffee*, 518 U.S. at 15) (quotation marks omitted); *Simon v. Cook*, 261 F. App'x 873, 886 (6th Cir. 2008) (similar); *see United States v. Shiver*, No. 1:05-cr-256, 2006 WL 3248544, at *2 (M.D. Ala. Nov. 8, 2006) ("While there exists a psychotherapist/patient privilege, it is not absolute and protects only against *compelled* testimony.") (emphasis in original), *report and recommendation adopted by* 2006 WL 8446139 (M.D. Ala. Nov. 21, 2006).

In *Shiver*, the defendant disclosed to his therapist information suggesting that he had engaged in child abuse. Believing that she had a state statutory duty to report this information to authorities, the therapist contacted the police. During the course of the resulting police investigation, defendant admitted to having inappropriate contact with a five year old female. *Shiver*, 2006 WL 3248544, at *1–2. In recommending the denial of the defendant's motion to suppress these statements and all evidence discovered during a search of his residence, the magistrate judge reasoned:

> In this case, [the therapist] was not compelled to reveal any confidential communications to law enforcement officers. [The therapist] was not contacted by the law enforcement officers and coerced into revealing confidential communications. Based on her understanding that she was a mandatory reporter under state law, [the therapist] voluntarily contacted law enforcement officers and disclosed to them Shiver's confidential communications to her. There is a marked difference between state confidentiality requirements and federal testimonial privileges. *See United States v. Chase*, 340 F.3d 978 (9th Cir. 2003). Whether [the therapist] was required by state law to disclose Shivers' [sic] communications to local law enforcement officers or not, the court concludes that the federal psychotherapist/patient privilege was not violated because [the therapist] was not compelled to testify against Shiver.

*Id*. at *3.

The Court finds the analysis in *Shiver* persuasive. Regardless of whether Ms. Pagendarm—and ultimately the Counselor and Social Worker Board—properly assessed the

7

state statutory duty to report, the fact remains that the therapist volunteered the information.[4] Officers did not visit her office and inquire as to the nature of her confidential communications with Richter, nor did they demand to see her notes from Richter's therapy sessions. Ms. Pagendarm sought out law enforcement and volunteered the information. "Common sense dictates that an evidentiary privilege, intended to protect someone from court *compelled* disclosures of secrets or confidences, is not applicable to a voluntary, unsolicited disclosure made to a law enforcement officer and then incorporated into an affidavit in support of a search warrant."[5] *United States v. Morgan*, No. 01-cr-45, 2001 WL 1402998, at *4 (D. Maine Nov. 8, 2001) (denying motion to suppress evidence recovered via search warrant containing therapist's confidential conversations with defendant, noting that "the significant factor, and one that is undisputed on this evidence, is that no law enforcement officer or other governmental representative, state or federal, solicited [the therapist's] assistance or contributed to his decision to breach the confidence")[6].

---

[4] At the motion hearing, defense counsel admitted that Ms. Pagendarm "voluntarily share[ed the information]" with law enforcement. (Doc. No. 34 (Motion Hearing Transcript) at 15.)

[5] Such a result is in keeping with courts that have "consistently held that the government may use confidential marital communications to investigate crimes, particularly when one spouse has volunteered the information." *United States v. Alexio*, Nos. 13-cr-01017, 13-01018, 2015 WL 6181752, at *2 (D. Haw. Oct. 21, 2015) (citations omitted). *See United States v. Lefkowitz*, 618 F.2d 1313, 1318 (9th Cir. 1980) ("The privilege against adverse spousal testimony is of no use to Lefkowitz because here his wife did not 'testify' against him, but provided information used to support the issuance of a search warrant.") (citation omitted); *United States v. Giavasis*, 805 F.2d 1037 (Table), 1986 WL 18086, at *3 (6th Cir. 1986) (per curiam) ("Privileges, of course, only protect against the disclosure of marital confidences in testimony, not cooperation with law enforcement officials."); *United States v. Carlson*, 946 F. Supp. 2d 1115, 1129 (D. Or. 2013) ("Because the marital privileges are not grounded in the Constitution, federal and state courts have refused to suppress evidence obtained as a result of one spouse's disclosure of confidential marital communications to the police") (quotation marks and citation omitted).

[6] At the motion hearing, defense counsel attempted to distinguish *Morgan*, in part, on the ground that the confidential communication the defendant shared with his therapist purportedly implicated the safety of a specific child (Doc. No. 34 at 8–9). However, such a fact only goes to whether the reporting was mandatory under the relevant state statute and had no bearing on the application of the psychotherapist-patient privilege.

And while Richter correctly points out that Fed. R. Evid. 1101(c) and (d) provide that the rules on privilege apply to all stages of a court's proceeding, including the issuing of arrest or search warrants, this fact does not change the result but, in fact, reinforces it. "Indeed, the very concept of 'privileged information' is intrinsically linked to court proceedings: the disclosure of the same information outside of a courtroom—for example, to a police officer—is most accurately described as a breach of confidentiality, not as a violation of privilege." *United States v. Carlson*, 946 F. Supp. 2d 1115, 1126 (D. Or. 2013) (citing secondary authority and noting that Rule 1101 "is directed at the courts, not at the law enforcement officers who apply for a warrant"); *see also Chase*, 340 F.3d at 985 ("The Federal Rules of Evidence apply only to proceedings in federal court" and noting that Rule 501 "is not implicated by an improper disclosure made outside of federal court proceedings") (citing Fed. R. Evid. 101); *Shiver*, 2006 WL 3248544, at *2–3 (noting that the psychotherapist-patient privilege "is an evidentiary one" and finding that there is a "marked difference between state confidentiality requirements and federal testimonial privileges") (citing generally, among authority, *United States v. Harper*, 450 F.2d 1032, 1045 (5th Cir. 1971)). Whether Ms. Pagendarm breached the confidentiality of these communications with Richter or not, her out-of-court disclosures did not violate Fed. R. Evid. 501 and the psychotherapist-patient privilege. Moreover, no law enforcement officer or other governmental representative, state or federal, solicited Ms. Pagendarm's assistance or contributed to her decision to breach the confidence and report the information and, therefore, law enforcement was entitled to use the volunteered information in the affidavit in support of the search warrant.

### B. *Leon*[7] **Good Faith**

But even if Richter's rights under the psychotherapist-patient privilege had been violated by the out-of-court disclosure—and the warrant should not have issued based upon these confidential communications—suppression of the evidence seized and the statements made to law enforcement would still be inappropriate.

Because operation of the exclusionary rule carries the heavy societal cost of suppressing otherwise reliable evidence of unlawful behavior, it is not "an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 137, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); *see Davis v. United States*, 564 U.S. 229, 237, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (noting that application of the rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence") (citation omitted); *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (noting that exclusion is a "last resort, not [a] first impulse"). Instead, for the exclusionary rule to take root, "the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237 (citation omitted). Thus, operation of the exclusionary rule is limited "to situations in which [the purpose of deterring future Fourth Amendment violations] is 'thought most efficaciously served.'" *Id*. (citation omitted). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id*. (quoting *United States v. Janis*, 428 U.S. 433, 454, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976)).

The good-faith exception to the exclusionary rule, first announced in *Leon*, recognizes the balance between enforcement of the Fourth Amendment and society's interest in punishing

---

[7] *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

criminal conduct. *See Davis*, 564 U.S. at 238–39. "The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id*. at 238 (quoting *Herring*, 555 U.S. at 143). Where "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence," the high cost of suppression outweighs its deterrent benefit. *Id*. (quoting *Leon*, 468 U.S. at 909; *Herring*, 555 U.S. at 137). "[T]he crucial finding needed to suppress evidence is whether 'police [mis]conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring*, 129 S. Ct. at 702).

Richter argues that it is "objectively unreasonable for a well-trained officer to believe that the affidavit here was based on probable cause when all the particularized facts in the affidavit providing any nexus between the place to be searched and the evidence sought are based on statements that the Supreme Court and the Sixth Circuit have long held to be privileged." (Doc. No. 24 at 22.) This Court has already determined that the psychotherapist-patient privilege was not violated, but even if it had been, the Court finds that the reasonable officer would have maintained a good faith belief that the warrant was properly issued.

The good faith exception does not apply in cases where the "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Laughton*, 409 F.3d 744, 750–51 (6th Cir. 2005) (citing *Leon*, 468 U.S. at 922, n.23.) In assessing what the "reasonably well trained officer would have known," Richter notes that this standard, found in *Leon,* charges the officer "with a certain minimum level of

11

knowledge of the law's requirements." (Doc. No. 35 at 6, quoting *United States v. Sacova*, 761 F.2d 292, 295 (6th Cir. 1985) (citing *Leon, supra*)). Citing cases like *United States v. Patel*, 579 F. App'x 449, 458 (6th Cir. 2014), Richter insists that "[f]ederal law enforcement officers routinely encounter situations in the course of their professional duties that require knowledge and application of federal testimonial privileges." (Doc. No. 35 at 6.)

The Court disagrees that the reasonably well trained officer would possess such an understanding of the law. The law assumes that the executing officers have "a reasonable knowledge of what the law prohibits[.]" *United States v. Rowland*, 145 F.3d 1194, 1207 (10th Cir. 1998). But "'it must . . . be remembered that the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers[.]'" *Id.* at 1207–08 (quoting with favor *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)). At the motion hearing, defense counsel acknowledged that the attorney-client privilege, for example, has a myriad of exceptions. (Doc. No. 34 at 16, 20.) Counsel went so far as to concede that if a client discussed ongoing criminal activity with him, he would likely seek counsel before making any determination as to his reporting requirements. (*Id.* at 17.)[8] Given that the application of perhaps the most well-known

---

[8] When defense counsel raised the attorney-client privilege as an example of a privilege that a reasonable officer would sufficiently understand, the Court posed the hypothetical question of whether an attorney would need to report a conversation with a client wherein the client advised that he was going to set off a bomb. Under the Court's hypothetical, the danger to the public was real, even though specific potential victims would not be known ahead of time or easily identified. (*Id.* at 16–17.) Defense counsel candidly admitted that he "would probably consult with disciplinary counsel, consult with the Supreme Court or other attorneys" before revealing such communications to the authorities. (*Id.* at 17.) Additionally, it is worth noting that in *Patel*, one of the cases Richter cites in support of assigning an understanding of privileges to officers, the officers who were tasked with flagging protected attorney-client conversations captured in a wiretap were assisted by an attorney. *See Patel*, 579 F. App'x at 459 (noting that "[c]oncerned that attorney-client privileged calls would occur in the future [with the wiretap], the government promptly established a 'filter team' comprised of agents *and a prosecutor* who were not working on the Patel case") (emphasis added).

and understood privilege is not always crystal clear to attorneys, the Court declines to find that the contours of the much less familiar psychotherapist-patient privilege (not to mention state laws relating to mandatory reporting by therapists) would necessarily be understood by the reasonable officer.

Ultimately, the Court finds that, even if the magistrate judge should not have issued the warrant with the confidential communications, suppression is not necessary because there is no need to curb or deter any inappropriate police behavior. S.A. Hack candidly and clearly outlined for the magistrate judge the basis for her belief that evidence of child pornography would be found in Richter's residence, and she explained in detail how the information came to be in her possession. There was no effort to deceive the magistrate judge or hide the fact that the information came by way of confidential communications between Richter and his therapist. Moreover, as is evident from the warrant itself, the officers were aware that Ms. Pagendarm had consulted a governing psychology board before determining that she was a mandatory reporter under Ohio law. The fact that several members of the health care field had determined that the report was proper (and even required under the law) would have reinforced the officers' good faith belief that the information was properly conveyed to law enforcement and ultimately properly used in the warrant application. Because the officers had a good faith belief that the search warrant was valid, the Court finds that suppression—even if the warrant was otherwise defective—would not be a remedy available to Richter.

For all of the above reasons, Richter's motion to suppress is denied.

### III. MOTION *IN LIMINE*

Richter also seeks an *in limine* ruling that Ms. Pagendarm may not testify at trial to the nature of any confidential communications that were exchanged between her and Richter as part of his mental health diagnosis and treatment. Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Criminal Procedure, the practice of ruling on motions *in limine* "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Motions *in limine* allow the court to rule on evidentiary issues prior to trial in order to avoid delay and to allow parties to focus remaining time on issues that will in fact be considered by the jury. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). *In limine* rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott*, 42 F.3d 999, 107 (6th Cir. 1994).

As discussed at length, the psychotherapist-patient privilege is an evidentiary privilege that protects "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment . . . from compelled disclosure[.]" *Jaffe*, 518 U.S. at 15. In recognizing the privilege, the Supreme Court noted that the "psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Id*. at 11. The government acknowledges that the psychotherapist-patient privilege applies to Ms. Pagendarm's in-court testimony unless an exception applies. (Doc. No. 34 at 34.)

14

Toward that end, the government invites the Court to carve out an exception to the psychotherapist-patient privilege for communications involving child abuse. (Doc. No. 29 at 7.) While acknowledging the important interest of ensuring open and honest communication between a mental health patient and his therapist, the government notes that there is also an important societal interest in deterring and preventing child abuse. (Doc. No. 34 at 36–38.) The government suggests that the Court should weigh the interest in facilitating frank privileged mental health communications against the interest in keeping the most vulnerable members of our society—children—safe. (*Id*. at 38 ["the argument is that for child abuse, that's where the nature of the crime then tips the scales and puts the societal interest to keep children . . . safe from harm above the interest to keep people being frank with" a mental health counselor].)

The Sixth Circuit has previously rejected the type of interest balancing proposed by the government. In *Hayes*, the court considered whether there was a "dangerous patient" exception to the psychotherapist-patient testimonial privilege. *Hayes*, 227 F.3d at 579. In *Hayes*, the government sought to prosecute the defendant for making threats, during his psychotherapy sessions, to murder his supervisor at the United States Post Office. *Id*. In refusing to graft a "dangerous patient" exception onto the psychotherapist-patient privilege to reach the privileged communications, the court acknowledged the competing interest of protecting potential victims from violence at the hands of an unstable mental health patient. Still, the court refused to recognize the exception because the "chilling effect" such an exception would have on the "atmosphere of confidence and trust" in the psychotherapist-patient relationship was too high a price to pay. *Id*. at 584–85.

Moreover, case law relied upon by the government does not support a carve-out in the context of the psychotherapist-patient relationship. Specifically, the government relies on cases like *United States v. Underwood*, 859 F.3d 386 (6th Cir. 2017), wherein the Sixth Circuit recognized a child abuse exception to the confidential marital communication privilege. There, the defendant-husband sought to prevent his wife from testifying regarding text messages and voicemails from her husband relating to his alleged sexual conduct with his minor step-daughter. *Id*. at 389. In finding that the marital privilege did not protect the confidentiality of these alleged communications, the Court emphasized that child abuse within the home and within the family has the effect of breaking down the marital relationship by profaning "the deep bond of trust and love between [marital partners] and disrupt[s] family harmony." *Id*. at 391–92 (citing, among authority, *United States v. Breton*, 740 F.3d 1, 11 (1st Cir. 2014)). Because the marital relationship was already fractured by the abuse, there was essentially little to protect by enforcing the privilege at the expense of the truth.

In contrast, the psychotherapist-patient relationship is in no way damaged by a patient's viewing child pornography or otherwise victimizing children online. In fact, this alleged conduct, or the desire to engage in such conduct, was the impetus for Richter to seek professional help and was the basis for the professional relationship. And as the Sixth Circuit made clear in *Hayes*, the importance of open and honest communication between a therapist and a mental health patient is so vital to the societal interest in promoting mental health that it cannot give way to other competing societal interests. *Hayes*, 227 F.3d at 585 ("Thus, if our Nation's mental health is indeed as valuable as the Supreme Court has indicated, and we think it is, the chilling effect that would result from the recognition of a 'dangerous patient' exception and its logical consequences

16

is the first reason to reject it.").

Accordingly, the Court rules *in limine* that Ms. Pagendarm may not testify at trial to any confidential communications she had with Richter in the context of the psychotherapist-patient relationship. That said, the Court emphasizes that this ruling is preliminary and subject to revisitation. *See Yannott*, 42 F.3d at 107 (*in limine* rulings are preliminary). The protection afforded to conversations with one's therapist depends upon a finding that the patient had a reasonable expectation that the communications would remain privileged. *See United States v. Sheppard*, No. 5:17-cr-26, 2021 WL 2152520, at *2 (W.D. Ky. May 26, 2021) ("for the psychotherapist-patient privilege to apply, the patient must have expected that the communications would remain only with the psychotherapist and undisclosed to others") (collecting cases). At this point in the proceedings, the record is devoid of any details relating to communications Ms. Pagendarm had with Richter regarding the extent to which their communications would remain confidential. If at a later point there is evidence to suggest that Richter was aware that communications regarding dangerous criminal conduct would not be held in confidence, the Court may need to revisit this ruling.

### IV. CONCLUSION

For the foregoing reasons, Richter's motion to suppress is DENIED, and his motion *in limine* is GRANTED.

**IT IS SO ORDERED**.

Dated: December 30, 2021

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**